# UNITED STATES DISTRICT COURT

for the

Southern District of California

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

Black Apple iPhone with a cracked case, seized on April 17, 2026 from the Travel Inn Motel, Room 202, located at 920 S. Beach Boulevard, Anaheim, CA. 92804

Case No. 26mj6914

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1, incorporated herein by reference

located in the Southern District of California, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B-1, incorporated herein by reference

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. §§ 1591 | Sex Trafficking of Children, Sex Trafficking by Force, Fraud, and Coercion |

The application is based on these facts:
See affidavit of Special Agent Alan Poindexter, incorporated herein by reference.

☑ Continued on the attached sheet.

☐ Delayed notice of ____ days (give exact ending date if more than 30 days: ____________ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

Alan Poindexter
*Applicant's signature*

Alan Poindexter, Special Agent, HSI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 11/19/2026

Janet A. Cabral
*Judge's signature*

City and state: San Diego, CA

Hon. Janet A. Cabral, United States Magistrate Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF APPLICATION FOR SEARCH WARRANT

I, Alan Poindexter, Special Agent with Homeland Security Investigations, being duly sworn, hereby states as follows:

## INTRODUCTION

1. I make this affidavit in support of an application for a search warrant to search the following electronic devices, as described in Attachments A-1 through A-3, and seize evidence of crimes, specifically, violations of Title 18, U.S.C., Secs. 1591(a) and (b)(2): Sex Trafficking of Children); Title 18, U.S.C., Secs. 1591(a) and (b)(1): Sex Trafficking by Force, Fraud, and Coercion), as more particularly described in Attachments B-1 through B-3:

A. Black Apple iPhone with a cracked case, seized on April 17, 2026 from the Travel Inn Motel, Room 202, located at 920 S. Beach Boulevard, Anaheim, CA. 92804 **(Target Device 1)**

B. Black Apple iPhone without a case, seized on April 17, 2026 from the Travel Inn Motel, Room 202, located at 920 S. Beach Boulevard, Anaheim, CA. 92804 **(Target Device 2);**

C. Blue Apple iPhone with a tan and black case, seized on April 17, 2026 from the person of Eric Eugene Johnson **(Target Device 3)**;

collectively, the **Target Devices**. This search supports an investigation conducted by Homeland Security Investigations (HSI), in conjunction with the San Diego Human Trafficking Task Force (SDHTTF), into Eric Eugene JOHNSON (**JOHNSON**) for the above-described violations. A factual explanation supporting probable cause follows.

2. The **Target Devices** are currently in the possession of SDHTTF, 9425 Chesapeake Drive, San Diego CA.

3. Based on the information below, there is probable cause to believe that a search of the **Target Devices** will produce evidence of the aforementioned crimes, as described in Attachments B-1 through B-3.

4. The information set forth in this affidavit is based on my own personal knowledge, knowledge obtained from other individuals during my participation in this investigation, including other law enforcement officers, my review of documents and computer records related to this investigation, communications with others who have personal knowledge of the events and circumstances described herein, and information gained through my training and experience. Because this affidavit is submitted for the limited purpose of obtaining search warrants for the **Target Devices**, it does not set forth each and every fact that I or others have learned during the course of this investigation, but only contains those facts believed to be necessary to establish probable cause.

## EXPERIENCE AND TRAINING

5. I am an investigative or law enforcement officer within the meaning of Title 18, United States Code, Section 2510(7); that is, an officer of the United States, who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Titles 18 and 21 of the United States Code.

6. I am a Special Agent (SA) employed by Homeland Security Investigations (HSI). I am a graduate of the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia and I have been employed as a SA since August of 2022. I have been trained to conduct criminal investigations for multiple violations of federal and state laws including, but not limited to alien smuggling and narcotics smuggling, human trafficking, weapons trafficking, narcotics trafficking, and organized criminal activity. Since June 2025, I have been assigned to the San Diego Human Trafficking Task Force (SDHTTF) where I have participated in investigations involving the exploitation of children and adults for

illicit commercial sex activity, human trafficking, forced labor, various illegal activities of criminal gang members and have performed a variety of related investigative tasks.

7. Since June of 2025, I have been assigned to the San Diego Human Trafficking Task Force (SDHTTF) where I have participated in investigations involving the exploitation of children and adults for illicit commercial sex activity, human trafficking, forced labor, various illegal activities of criminal gang members and have performed a variety of related investigative tasks.

8. My experience as an HSI Special Agent has included the investigation of cases involving the use of computers and the internet to commit crimes. I have received training and gained experience in interviewing and interrogation techniques, arrest procedures, search warrant applications, the execution of searches and seizures, computer evidence seizure and processing, and various other criminal laws and procedures. I have personally participated in the execution of search warrants involving the search and seizure of cellular telephones and other electronic devices.

9. Through my training, experience, and consultation with other law enforcement officers, I have learned that:

a. Individuals involved in illicit commercial sex maintain records, including electronic files, related to their illicit purchases on computers and computer servers hosting internet applications such as electronic mail (email) and personal social networking web pages;

b. Individuals involved in illicit commercial sex often seek commercial sex services through electronic advertisements and other media, such as Craigslist, MegaPersonals, Skipthegames, and other social media sites accessed on cellular telephones and computers;

c. Individuals involved in illicit commercial sex maintain records of correspondence relating to contact information as well as travel and lodging arrangements involved in such illegal activity;

d. Individuals involved in illicit commercial sex maintain financial records, bank statements, money orders, money order receipts, and cash that are evidence of payments made in conjunction with prostitution;

f. Individuals involved in illicit commercial sex use cellular telephones, tablet, desktop, removable hard drives and flash drives, and notebook computers and maintain these items on their person and/or in their residences and/or vehicles. Individuals involved in illicit commercial sex use cellular telephones, tablet, notebook computers, and removable storage media to increase their mobility and coordinate illicit activities. Individuals involved in illicit commercial sex will use multiple cellphones, tablets, notebook computers, phone numbers, and internet-based messaging apps in order to maintain contact with commercial sex workers. These electronic devices contain wire and electronic data concerning telephonic contact records, text messages, and electronic mail messages with commercial sex workers, as well as telephone books containing contact information for commercial sex workers. Individuals involved in illicit commercial sex also utilize digital cameras, cellular telephones, desktop and notebook computers with photograph and video capabilities to take photographs and videos of themselves in response to verification requests from commercial sex workers. Moreover, I know that digital evidence can be stored on a variety of systems and storage devices including: hard disk drives,

DVD ROMS, pagers, money chips, thumb drives, flash drives, and portable hard drives;

g. Individuals involved in illicit commercial sex use social media sites like Facebook or Instagram to find commercial sex workers. They use messaging applications to communicate with commercial sex workers to increase their mobility and coordinate illicit activities. Individuals involved in illicit commercial sex will often use multiple social media accounts in order to maintain contact with commercial sex workers. These social media accounts contain electronic data concerning instant messaging, electronic mail and social media addresses of commercial sex workers.

10. Based upon my experience and training, and the experience and training of other agents with whom I have communicated, the evidence of illegal activity described above in paragraphs “a” through “g” is maintained by individuals involved in illicit commercial sex in property that they and their associates live in and operate as well as on online accounts including email accounts, which can be accessed on computers and cellular telephones.

## FACTS IN SUPPORT OF PROBABLE CAUSE

*ORIGINATION*

11. On April 7, 2026, investigators from the San Diego Human Trafficking Task Force (“SDHTTF”) conducted a proactive operation in National City, California. The SDHTTF investigation was focused on the area surrounding the "blade" in National City. A “blade” is an area known in the pimping and prostitution subculture for high volumes of street-based prostitution. National City's current "blade" is in the 000–700 block of Roosevelt Avenue and National City Boulevard, both of which are parallel and separated by one city block. This area is predominantly commercial and consists of five separate hotels.

12. During the operation, investigators observed female wearing only a blue jacket, blue thong, and blue bra, walking in the area of 300 Roosevelt Ave, National City, California. Believing the female might be a juvenile based on her youthful appearance, investigators initiated brief surveillance.

13. At approximately 1500 hours, on the same date, investigators then observed JF1 enter a white van bearing a California license plate. Based on investigators' observations, a marked National City Police Department (NCPD) unit, along with SDHTTF task force officers (TFOs), made contact with the vehicle's occupants. Upon approaching the vehicle, investigators observed a white male, later identified as R.B., sitting in the driver's seat with his penis exposed and wearing a condom, and JF1 seated in the front passenger seat. Additionally, according to his report, NCPD Officer C. Bernal observed JF1 wearing clothing exposing her breasts and buttocks, providing oral sex to a white male, later identified as [R.B.].

14. Both occupants were removed from the vehicle and separated. NCPD Officer C. Bernal and SDHTTF TFOs C. Kombo and K. Buchholtz initially contacted JF1, who provided the name "Aiyanna Tucker," DOB [redacted]2005. Law enforcement conducted records checks using the name and date of birth JF1 provided in California, Washington, and Pennsylvania, with negative results.

15. HSI SA Alan Poindexter, a TFO with the SDHTTF, conducted an informal interview with the female while she waited in the back of the marked police vehicle. SA Poindexter explained that he and his team were part of a human trafficking task force and that JF1 was not in trouble, but that they needed to confirm her identity to determine if she was a minor. SA Poindexter explained that, without a proper name and date of birth, JF1 could not be released. JF1 insisted that she was 21 years old and claimed that she had no idea why police could not confirm her identity. SA Poindexter asked JF1 if she had a copy of her identification on her phone. JF1 stated that her phone was new and she did not have a copy in her phone.

16. SA Poindexter asked JF1 if she would provide verbal consent to look through her phone. JF1 agreed and provided verbal consent for a manual review of her cell phone. SDHTTF investigators looked through JF1's phone and determined that it did appear to be new, noting that there were very few phone calls or text messages. Police observed a single contact in the phone saved as a heart emoji. The phone number for that contact was 619-987-7291.

17. SA Poindexter asked JF1 to explain how she got into "the life." JF1 recounted her personal history and stated that she was not being trafficked and denied having a pimp. JF1 explained that she had been a commercial sex worker for slightly over a month. JF1 claimed that she learned quickly but also got some information from social media and other commercial sex workers. JF1 again denied being sex trafficked and/or having a pimp. JF1 stated that she would never give money to another person. JF1 stated that she previously had a boyfriend in Washington State, but they broke up after a domestic dispute, and it was at that point that she entered commercial sex work to survive.

18. When law enforcement's efforts to corroborate JF1's identity proved unsuccessful, SA Poindexter asked JF1 if she was staying at a hotel in the area. JF1 stated that she was staying at the Big 7 Motel in Chula Vista, California, in room number 115 and that the room was rented under her name using government-issued identification. Law enforcement spoke to staff at the Big 7 Motel, who provided a copy of the driver's license used to rent room 115. The motel registration card provided by staff showed that the room was rented under the name "Aiyanna Tucker" using a Pennsylvania driver's license. Law enforcement conducted record checks using the PA license number, which returned a different name for a Caucasian, 30-year-old female.

19. SA Poindexter informed JF1 that the driver's license she provided was false. SA Poindexter asked JF1 if she was a juvenile. JF1 smiled and reiterated that

she was an adult. SA Poindexter explained that JF1 appeared to be young and that investigators believed she was likely a juvenile, reminding JF1 that she was not being released because she was believed to be a child. SA Poindexter asked JF1 if she was a runaway. JF1 looked away and began to cry but did not respond. JF1 stated that she would not provide her name or date of birth and that investigators would have to figure it out. At approximately 1747 hours, investigators determined JF1's identity.

*IDENTIFICATION OF JOHNSON*

20. At approximately 1800 hours, HSI SAs Poindexter and E. Ruvalcaba, both members of the SDHTTF, conducted an interview with JF1 at NCPD headquarters. JF1 stated that everything she initially told investigators about why she began commercial sex work was true and that she felt it would be a way to make fast money to support her siblings. JF1 stated that she had never been reported missing by her family. JF1 stated that she believed she would be reported missing by Child Welfare Services because she was previously caught in Los Angeles, California, for commercial sex work. JF1 stated that her uncle had custody of her, explaining that her uncle resides in Washington State. JF1 said that she began commercial sex work only after leaving her uncle's residence. JF1 claimed that she worked the blade in Seattle but that she mostly scammed tricks, but when she came to California, she realized that she could not get away with it. JF1 stated that she booked a Greyhound bus ticket from Seattle, Washington, to Los Angeles, California, because the money in Seattle was not good enough. JF1 claimed that she booked the ticket and traveled alone. JF1 said that she traveled to San Diego after she saved enough money to buy her fake identification and a phone.

21. SA Poindexter again asked JF1 for consent to search her iPhone. JF1 provided written and verbal consent to search her phone. SA Poindexter asked JF1 about the contact saved in her phone as a heart. JF1 stated the male was uninvolved

but that he orders her Uber rides. JF1 stated she does not pay the male for the Uber and keeps all her money. Investigators asked JF1 where she kept the money she saved. JF1 said that the money was sitting in her hotel room but initially refused to provide consent for police to enter the room. SA Poindexter asked JF1 if the male saved as a heart in her phone was in the room, and she said no. JF1 claimed that she was not dating the male but that they were in the courting phase of their relationship. JF1 stated that the male knew she was 17, further stating that everyone knows her age "except the tricks." JF1 claimed that the male was 18. JF1 claimed that the male's name is "Diego." JF1 said that she has known the male since she arrived in Los Angeles. JF1 further stated that the friend who introduced them was also a sex worker who stopped talking to her when JF1 was stopped by police for being an underage sex worker. JF1 said that "Diego" is a Black male. JF1 initially claimed that she had never met "Diego" in person. SA Poindexter explained that in reading through her text messages with "Diego," it was apparent that she had met him before and that he had been inside her motel room. JF1 then admitted that "Diego" was at her motel on April 7th but claimed that she was unsure if he was still there. JF1 described "Diego" as a black male with dreadlocks. JF1 stated that "Diego" knows that she is a commercial sex worker but again denied that he is her pimp.

22. On April 7, 2026, a commercial database search for phone number 619-987-7291 returned to 25-year-old Eric Eugiene JOHNSON (DOB [redacted]2001). JOHNSON was known to SDHTTF investigators by his moniker "Bliffy." A law enforcement database search for JOHNSON revealed prior firearms-related charges.

23. On the same date, SDHTTF investigators and uniformed officers from the Chula Vista Police Department (CVPD) went to the Big 7 Motel located at 333 Broadway, Chula Vista, CA 91910. As SA Poindexter approached the motel service desk, he observed a black male in a dark Chrysler sedan driving out of the parking

lot slowly and appearing to look closely at vehicles and pedestrians. The Chrysler had a California license plate (9WAS862) and appeared to have a single occupant.

24. SA Poindexter contacted motel staff and inquired about the occupants of room 115. Motel staff stated that although a female rented the room, a tall black male with "twist" in his hair did pay for the room at one point. Motel staff also provided SA Poindexter with a guest registration card for the room, which listed a black Chrysler tied to the room with a California license plate ending in 862. Additionally, the registration card listed two occupants. A law enforcement database search for 9WAS862 was conducted on April 7, 2026, and the vehicle was registered to Eric Eugeine JOHNSON. CVPD also noted that JOHNSON had recently been contacted by police near the motel.

25. On April 10, 2026, SA Poindexter received a video from JF1's family members, which appeared to be a screen recording of an Instagram story. In the video, an unidentified female, later identified as AF1, that "Eric Johnson is pimping on minors!!". The post included JF1's date of birth and described her Los Angeles police contact.






26. On April 10, 2026, SA Poindexter was informed that JF1 absconded from a temporary shelter for children with two other female juveniles recovered by the SDHTTF on or about April 9, 2026.

27. On or about April 13, 2026, SA Poindexter issued a subpoena for four phone numbers, including 619-987-7291. On the same date, AT&T returned subscriber information for target number 619-987-7291. Eric Eugene JOHNSON was listed as the user with an address of 6895 Potomac St Apt 168, San Diego, CA 92139.

28. On or about April 15, 2026, SA Poindexter tied phone number 619-987-7291 to a Cash App account with cashtag "$bliffybuckz."

*ORANGE COUNTY RECOVERY OF JF1*

29. On or about April 17, 2026, SA Poindexter received a phone call from Investigator K. Murphy from the Orange County Sheriff's Department stating that the Orange County Human Trafficking Team was conducting surveillance on JOHNSON at a hotel in Anaheim, California. Investigator Murphy stated that he believed, based on information received from an adult female victim, that JOHNSON was potentially with three juvenile females. Investigator Murphy also explained that the adult female victim had been attacked by a group of young females (allegedly at JOHNSON's direction) and that the adult victim's phone, which was taken during the assault, was believed to be at the location with JOHNSON.

30. On April 17, 2026, believing that the two other juvenile females reportedly with JOHNSON might be missing from San Diego County and that JF1 was likely with JOHNSON, investigators from the SDHTTF responded to Orange County to assist with interviews and potential recovery logistics. On the same date, the Orange County Human Trafficking team and the Tactical apprehension team conducted an enforcement action at the Travel Inn Motel located at 920 S Beach Blvd, Anaheim, CA, where JOHNSON and JF1 were staying. JF1 was taken to an

Orange County Sheriff's station be interviewed. The other two juvenile females SDHTTF team members were looking for were not located.

**APRIL 17, 2026 COMMUNICATION WITH JF1**

31. After the Orange County team conducted their interview, SA Poindexter spoke with JF1, who began crying almost immediately. JF1 provided the following statement:

32. SA Poindexter asked JF1 who JOHNSON was to her. JF1 claimed that JOHNSON was her cousin. SA Poindexter explained that he had already spoken to JF1's family and confirmed that JOHNSON was not related to her and that they did not know JOHNSON. JF1 stated that she did not want any further police involvement, claiming that police contact only made things worse. JF1 claimed that she had not done any dates while in Orange County, claiming that she mostly did "escort services." JF1 did not clarify what exactly she did as a part of her escort services.

33. JF1 stated that although JOHNSON was aware of what she did, he did not approve. SA Poindexter showed JF1 the video that mentions her date of birth and JOHNSON being a pimp. JF1 said that she did not know why the female in the video would say that and denied knowing the female in the video. SA Poindexter told JF1 that he did not believe her story, but that he would still try to help in any way he could. JF1 again stated that she did not want police assistance.

34. On April 17, 2026, Investigators from the Orange County Human Trafficking team agreed to work in conjunction with the SDHTTF.

*ORANGE COUNTY INVESTIGATION*

35. On or about June 11, 2026, after consistent coordination, SA Poindexter received the Orange County reports related to JOHNSON's April 17, 2026, arrest. In reviewing the reports SA Poindexter learned the following:

36. On April 16, 2026, at about 2302 hours, Deputy T. Cleary was dispatched to the area of Beach Blvd and Second St in reference to a female who had been sprayed in the face. The deputy located a female, Adult Female 1 ("AF1") at the Casa Playa Inn (10301 Beach Blvd, Stanton, CA 90680). According to Orange County investigators, Beach Blvd is the "blade" within their County. When law enforcement contacted AF1 she had visible injuries to her face, body, and was complaining of pain to her face from being sprayed with pepper spray.

37. AF1 told Deputy Cleary that she was standing at the corner of Beach Blvd and Second St working as a prostitute. At about 2230 hours, a 2011 Chrysler 200, black in color, bearing California License Plate 9WAS862, which was driven by JOHNSON stopped on Beach Blvd. The front passenger exited the vehicle and AF1 immediately recognized her as a juvenile female being trafficked by JOHNSON. Two additional unidentified female individuals also exited the vehicle. Upon making contact with AF1, JF1 physically assaulted her by striking AF1 and subsequently deploying pepper spray directly into her face, causing immediate pain and temporary impairment. During the assault, JF1 forcibly took AF1's Apple iPhone, which also contained her identification card. After obtaining the property, all three females reentered the Chrysler and fled the area.

38. During Deputy Cleary's investigation, AF1 stated JOHNSON was her trafficker who forced her to work as a prostitute. AF1 was transported to the Stanton Substation to be interviewed by Orange County Sheriff's Human Trafficking investigators.

*APRIL 16, 2026 INTERVIEW OF AF1*

39. On or about April 16, 2026, the Orange County Sheriff's Human Trafficking team interviewed AF1 who provided the following statement: In July 2024, AF1 began commercial sex work in San Diego, CA. After a few days of working on Roosevelt Ave, she was approached by JOHNSON who introduced

himself as "Bliffy". AF1 said Bliffy was JOHNSON's street name. She described JOHNSON as being kind and he asked her if she wanted to rest her feet and charge her cellphone inside his vehicle. AF1 stated that she believed JOHNSON was a possible "John". AF1 entered the vehicle, and JOHNSON drove her to his residence at 6895 Potomac St Apt. 168, San Diego. AF1 said she and JOHNSON were in a romantic relationship. AF1 lived with JOHNSON and his parents for about a week and did not work as a prostitute during that time. AF1 stated that JOHNSON was working for a third-party company as an Amazon delivery driver using his mother's vehicle. AF1 said that JOHNSON's income could not sustain their lifestyle and he asked AF1 to go back to Roosevelt Ave and work as a commercial sex worker. AF1 stated that she worked on Roosevelt Ave. JOHNSON regularly drove her to and from Roosevelt Ave so she could engage in prostitution. AF1 said that, with the money she earned, she paid for JOHNSON's clothing and food and helped pay to repair his mother's vehicle.

40. AF1 described JOHNSON as a "boyfriend pimp". AF1 stated that in September 2025 AF1 was contacted by the Pomona Police Department and, because she did not have any identification, they believed she was a juvenile, AF1 was transported to their substation for further investigation. AF1 was released a short time later, she called JOHNSON, and he had driven back to San Diego. AF1 stated that she was irate because she did not have any means of transportation. JOHNSON arrived and during an argument, JOHNSON punched AF1 in the face with a closed fist. AF1 said the force of the punch caused her head to whip back and hit against the car. AF1 said this is when the physical and mental abuse began. AF1 claimed that she had visible injuries to her face, and JOHNSON drove AF1 back to San Diego and forced her to go onto Roosevelt Ave to work as a prostitute.

41. AF1 stated that JOHNSON wanted her to tattoo herself with his moniker "Bliffy". AF1 refused initially but said she feared JOHNSON would

retaliate by physical violence if she did not do so, AF1 agreed and he transported her to San Diego where she was tattooed with "Bliffy" on the left side of her neck, just below her ear. AF1 stated that after the tattoo JOHNSON transported her back to Los Angeles to work the Figueroa Corridor.

42. AF1 said that on or about March 27, 2026, JOHNSON transported AF1 and JF1 to 84th Pl and Figueroa St to work as prostitutes. AF1 captured a photograph of her and JF1 working that night.



JF1 is located on the left-side of the photograph in only a red bra and fishnet stockings. AF1 is located on the right side of the photograph in only a white jacket and thong underwear. On the same date, AF1 and JF1 were contacted by the Los Angeles Police Department and asked for their identification. During the investigation, it was revealed JF1 was a juvenile. LAPD officers took custody of JF1. AF1 stated that she returned to the motel and notified JOHNSON that JF1 was a juvenile and was arrested by the LAPD.

43. AF1 stated that on or about March 28, 2026, at about 0600 hours, she woke up to JF1 banging on the motel room door. JOHNSON opened the door and let AF1 into the room. AF1 told JOHNSON she did not want to be associated with JF1 due to her being a juvenile and knew the legal ramification if caught together.

AF1 said that JOHNSON became angry, yelled at her, and dismissed her concern. After yelling at AF1, JOHNSON told her to go to Figueroa Street to work.

44. On March 28, 2026, AF1 decided she wanted to leave JOHNSON and went to Amber Motel located at 10825 Crenshaw Blvd, Inglewood, CA. AF1 said that she was heading back towards the blade when she saw JOHNSON and JF1 charging at her. JOHNSON was holding a knife in his hand. AF1 said that she was in fear for her life and ran into her motel room, locked the door, and called 911. JOHNSON then broke the glass window and used an unknown accelerant with a heat source and started a fire inside the room. AF1 was able to put out the fire and JOHNSON left the area prior to law enforcement arrival.

45. During the interview on April 17, 2026, AF1 told investigators that she paid the bill on JOHNSON's phone using phone number 619-987-7291.

*APRIL 17, 2026 INTERVIEW OF JOHNSON*

46. On April 17, 2026, Orange County investigators conducted a post-Miranda interview of JOHNSON. During the interview, JOHNSON stated that JF1 was his cousin. JOHNSON was unable to explain the family lineage but claimed that he and JF1 were, "blood" relatives. JOHNSON claimed that he was in the area of North San Diego County and drove to Orange County to help JF1.

47. JOHNSON said that he arrived in Orange County and claimed he met JF1 at Lamar Park. Investigators conducted an open-source web search using google.com and were not able to locate Lamar Park in Orange County. JOHNSON continued and changed his story, saying he met JF1 at the Travel Inn Motel. JOHNSON said that he went to the motel and JF1 was there with female friends.

48. Investigators explained to JOHNSON that JF1 was involved in a fight with another female and JF1 had taken the female's cellphone and identification card, both of which were found in the motel room where JOHNSON and JF1 were detained. JOHNSON then changed his story again and said JF1 called him via

telephone and said she was involved in a fight and needed to be picked up. JOHNSON said that JF1 told him that she was on Beach Blvd and saw a female whom she had prior issues, and that JF1 fought the female, before asking JOHNSON for a ride. Investigators told JOHNSON the victim knew him by his full name, date or birth, and his vehicle's license plate. JOHNSON denied any knowledge other than what JF1 had told him. Investigators showed JOHNSON an Instagram post that AF1 had posted in March of 2026. The post read, "Eric Johnson is pimping on minors!! I have all the text and proof pedo on the run be careful!".

49. After seeing the post, JOHNSON admitted he has known AF1 for a few months. Investigators further explained there were stationary license plate reader cameras on Beach Blvd which captured JOHNSON's vehicle on Beach Blvd at the time of the crime. JOHNSON admitted he was driving on Beach Blvd at the time but claimed he was not present at the fight and that he was looking for JF1 because she had called him and asked for a ride. JOHNSON said he picked up JF1 and her friends from Beach Blvd and drove them to the Travel Inn Motel. When investigators asked JOHNSON about his involvement in pimping AF1 and JF1, JOHNSON denied any involvement. During the conversation, investigators asked JOHNSON about his knowledge of prostitution and specific "tracks" or "blades" in San Diego, Los Angeles, and Orange County. JOHNSON did not directly answer questions about those locations. However, he did admit that he was familiar with prostitution. JOHNSON requested his attorney and the interview concluded without incident.

*IDENTIFICATION OF THE TARGET DEVICES*

50. During the recovery of JF1 from the Travel Inn Motel where JOHNSON and JF1 were staying, Orange County law enforcement officers conducted a protective sweep of the room and located a black Apple iPhone with a cracked case, **Target Device 1**, and AF1's identification card. Orange County law enforcement personnel performed a limited digital forensic extraction of **Target**

**Device 1** and, during the review of that extraction, located images of JOHNSON in the media stored within **Target Device 1**.

51. During the recovery of JF1 from the Travel Inn Motel where JOHNSON and JF1 were staying, Orange County law enforcement personnel conducted a protective sweep of the room and located a black Apple iPhone without a case, **Target Device 2**, underneath one of the beds. Orange County law enforcement officers performed a limited digital forensic extraction of **Target Device 2** and, during the review of that extraction, located an image of the fraudulent Pennsylvania driver's license with JF1's photograph that was used on or about April 7, 2026 in San Diego.

52. When JOHNSON was detained, he had a blue Apple iPhone with a tan and black case, **Target Device 3**, in the right front pocket of his pants. Orange County law enforcement personnel later called the x7291 number previously attributed to JOHNSON and **Target Device 3** rang.

53. Identity is an element of every crime. Establishing the individual with access to or control over the **Target Devices** at or around the time when data or applications were accessed or when electronic records, communications, and data such as emails, text messages, photographs, audio files, videos, and location data were generated helps attribute that evidence to a particular individual. Thus, items that tend to identify the user of, or persons with control over or access to, the **Target Devices** also constitute evidence of the offenses being investigated.

**METHODOLOGY FOR CELLULAR DEVICES**

54. It is not possible to determine, merely by knowing the mobile electronic device's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Mobile electronic devices, including cellular telephones and tablets, can be simple cellular telephones and text message devices, can include cameras, can serve as

personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers and installable software now allow for their subscribers and users to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many mobile electronic devices do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some mobile electronic device models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

55. Following the issuance of these warrants, I will collect the **Target Devices** and subject them to analysis. All forensic analysis of the data contained within the **Target Devices** and their memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

56. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the

analysis within ninety (90) days of the date this search warrant is signed, absent further application to this court.

## GENUINE RISKS OF DESTRUCTION OF DATA

57. Based upon my experience and training, and the experience and training of other law enforcement agents with whom I have communicated, electronically stored data may be permanently deleted or modified by users possessing basic computer skills. In this case, OLEA is currently in custody so there appears to be a minimal risk regarding the destruction of evidence.

## PRIOR ATTEMPTS TO OBTAIN DATA

58. Orange County Sheriff's Department investigators have previously searched the **Target Devices**, pursuant to search warrants issued by the Honorable Bryan Clavecilla, Superior Court Judge, Orange County California.

59. SDHTTF investigators obtained search warrants for the **Target Devices** which were issued by the Honorable Autumn D. Spaeth, United States Magistrate Judge, Central District of California. The **Target Devices** were then seized from the Orange County Sheriff's Department and transported to the SDHTTF.

//

//

//

//

//

//

//

//

//

## CONCLUSION

59. Based on the foregoing, I submit there is probable cause to believe items that constitute evidence, fruits, and instrumentalities of violations of federal criminal law, namely, Title 18, U.S.C., Secs. 1591(a) and (b)(2): Sex Trafficking of Children); Title 18, U.S.C., Secs. 1591(a) and (b)(1): Sex Trafficking by Force, Fraud, and Coercion), as described in Attachments B-1 through B-3, will be found in the property to be searched, as described in Attachments A-1 through A-3.

60. I therefore respectfully request that this Court issue warrants authorizing me, an HSI Special Agent, or another law enforcement officer, to search the **Target Devices**, as described in Attachments A-1 through A-3 and seize the items listed in Attachments B-1 through B-3.

I swear the foregoing is true and correct to the best of my knowledge and belief.

Alan Poindexter
Special Agent
Homeland Security Investigations

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone on this 19th day of November 2026.

HONORABLE JANET A. CABRAL
UNITED STATES MAGISTRATE JUDGE

# ATTACHMENT A-1
# ITEM TO BE SEARCHED

The property/items to be searched is/are described as follows:

> Black Apple iPhone with a cracked case, seized on April 17, 2026 from the Travel Inn Motel, Room 202, located at 920 S. Beach Boulevard, Anaheim, CA. 92804 **(Target Device 1)**

**Target Device 1** is currently being held at the SDHTTF Office located at 9425 Chesapeake Dr. San Diego, CA 92123.

# ATTACHMENT B-1
# ITEMS TO BE SEIZED

Authorization to search the cellular telephone described in Attachment A-1 includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the cellular telephones. The seizure and search of the cellular telephone will be conducted in accordance with the affidavit submitted in support of the warrant.

The evidence to be seized from the cellular telephone will be electronic records, communications, and data such as emails, text messages, photographs, audio files, video, telephone numbers, contact information, web browsing history, documents, data stored within applications, and location data, for the period of **July 1, 2024 through April 17, 2026**:

(1) tending to indicate efforts to recruit, entice, harbor, transport, provide, obtain, or maintain a person for the purposes of engaging in a commercial sex act;

(2) tending to identify accounts, facilities, storage devices, and/or services—such as email addresses, IP addresses, and phone numbers— used to facilitate human trafficking;

(3) tending to identify bank accounts and transactions involved in payments for commercial sex acts;

(4) tending to show efforts to advertise individuals on websites for commercial sex acts;

(5) tending to identify the transportation of individuals to, or presence at, locations used for commercial sex acts;

(6) tending to identify the user of, or persons with control over or access to, the subject phone; or

(7) tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data described above

which are evidence of violations of Title 18, U.S.C., Secs. 1591(a) and (b)(2): Sex Trafficking of Children; Title 18, U.S.C., Secs. 1591(a) and (b)(1): Sex Trafficking by Force, Fraud, and Coercion .

The seizure and search of the cellular phones shall follow the procedures outlined in the methodology section in the supporting affidavit. Deleted data, remnant data, slack space, and temporary and permanent files on the cellular phones may be searched for the evidence above.